(No. 4385-

HENRY I. BROWN, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed September 7, 1951.*

GEORGE W. KASSERMAN, JR., Attorney for Claimant.

IVAN A. ELLIOTT, Attorney General; CHARLES H. EVANS, Assistant Attorney General, for Respondent.

DELANEY, J.

Claimant, Henry I. Brown, seeks to recover for complete and permanent disability under the Workmen's Compensation Act, as the result of an accident that arose out of and in the course of his employment as an employee of respondent.

Mr. Henry I. Brown was married, and 40 years of age on February 15, 1950, the date on which the injury complained of arose. He informed the Division that he had four children under 18 years of age dependent upon him for support. He resides in the City of Newton, Jasper County, Illinois.

He was first employed by the Division of Highways on February 14, 1949 as a maintenance labor foreman at a salary of $223.00 a month. He worked continuously in this same classification from the date of his

employment until the date of his injury. His salary was increased to $246.00 a month on July 1, 1949, and he earned a total of $2,849.33 in the year preceding his injury.

On February 15, 1950, Mr. Brown was in charge of a group of men engaged in placing sandbags on a levee to protect it from flood waters of the Wabash River. The work was being done approximately one mile south of Russellville in Lawrence County. At about 2:00 P.M. a tractor, which was being used to haul filled sandbags to the levee, bogged down in soft ground near the levee. The tractor was stalled in a low place, which would be covered with water if the weakened levee, which was nearby, should give away. Mr. Brown and his men gathered around the tractor, and pushed it out of the mud. While pushing on the tractor, Mr. Brown felt a burning pain in his left chest, which radiated down his left arm. Although he felt poorly, he continued working until approximately 5:00 P.M., and then went to a hotel in Palestine, Lawrence County, for the night. He had a light dinner, and went to bed early. At approximately 10:00 P.M. he was awakened by the return of the pain in his left chest. This pain, which was severe enough to cause him to break out in a sweat, lasted approximately 30 minutes and then subsided.

At approximately 5:45 A.M. on February 16, while Mr. Brown was dressing to begin his day of work, the pain returned again, and was so severe that Dr. L. R. Illyes was called to the hotel. Dr. Illyes made a diagnosis of an acute heart attack, and administered medication to relieve the acute symptoms. Later that morning, Mr. Brown became comfortable enough to be moved to the Olney Sanitarium, Olney, Illinois,

where he was placed in the hands of Dr. Charles W. Harrison for treatment.

On March 3, 1950, Dr. Illyes submitted the following report:

"Heart attack—probably brought on by the heavy lifting and exertion he did the previous day. Treatment—kept patient quiet and gave him medicine to relieve the pain. Estimated date patient able to work—Indefinite. Date patient was discharged—2-16-50."

Dr. Harrison submitted a report on April 11, 1950, which is quoted below:

"Patient suffered from an anterior myocardial infarction, which came on sometime after exertion. Treatment—Sedation. Bed rest. Vaso-dilators. X-Rays— No Remarks—Electrocardiograms diagnostic of anterior myocardial infarction. Estimated date patient able to work—Light work about July 1, 1950. What permanent disability do you expect?—Unable to state at present time what the cardiac status will be."

On July 8, 1950, Dr. Harrison reported again, as follows:

"Mr. Brown was last seen by me on June 6, 1950, and an EKG was taken at that time. The results were quite satisfactory, with progress expected following a myocardial infarction.

I anticipate that Mr. Brown will be able to return to light work sometime within the next month to six weeks."

Dr. Harrison again reported on July 15, 1950, as follows:

"Mr. Brown was in yesterday, and another electrocardiogram was run. The results of this continue to show improvement, with this last tracing being practically normal. He still does have some tiredness on exertion, which is to be expected, and some pains in the chest, which I attribute to muscle, rather than the heart.

I am releasing him for light work as of August 1st, and would appreciate it if he would be allowed to work only to the point of fatigue, rather than past it, for a week to ten days. This is a trial period for him, and if he handles the first week or so as far as his mental outlook is concerned he would be in a much better position to carry on a normal life thereafter. I believe we have no worries about his heart, other than what might come whether he worked or not. If you have any questions, I shall be glad to answer them for you."

On July 27, 1950, Dr. Harrison sent the Division the following report:

"Mr. Brown was in my office the other day with a rather severe common cold. I talked to his wife today, and she said he was still running some fever and not feeling up to par. If it isn't asking too much, I would like to postpone his return to work until the middle of August.

Thank you kindly."

Dr. Harrison called the Effingham office of the Division of Highways on August 9, 1950 to ask authorization to send Mr. Brown to St. Louis for an examination by Dr. Edward Massie, a specialist in heart diseases:

Dr. Massie submitted the following report on August 17, 1950:

"This letter concerns your patient Mr. Henry Brown. He gives a history of having had a coronary thrombosis. The story is typical. The electrocardiograms which you sent along are also typical of an anterior myocardial infarction. Six months have now passed, and he still has pain. The pain, however, is more in the left upper shoulder, and it seems to sometimes occur down the arm, and he has some numbness of two fingers of the left hand. Moving of his shoulder and arm seem to make the left upper shoulder discomfort worse. It has a duration of some hours, and it does not occur on exertion, and may occur at any time. If he lies down and rests his arm quietly, it seems to go away. In questioning about precardial discomfort on exertion there is now no history suggestive of coronary artery pain. He has become a little anxious about himself, and, although he was not nervous before, he feels more tense, and at times he feels quivering in the left chest.

Examination revealed a well developed man who was slightly overweight with normally reacting pupils, normal optic fundi, negative throat, normal thyroid, no definite cardiac enlargement, fairly good heart sounds, regular rhythm, no significant murmurs, pulse rate 84 per minute, blood pressure 140/100, clear lungs, negative abdomen and no dependent edema.

I took an electrocardiogram with twelve leads as you had done, and find that there is now a good looking tracing, which is just about normal. This resembles your last tracing. Certainly there is tremendous improvement over the initial tracing when he had his acute attack. I fluoroscoped him, and found his lungs to be clear, and the heart size and shape not to be unusual, although the heart size might be at the upper limits of normal.

I feel that this patient still has residuals of a shoulder-arm syndrome. This accounts for the discomfort in his left shoulder and left arm, and the numbness in the two fingers of his left hand. When he had the acute attack of coronary thrombosis I believe he developed an acute bursitis and arthritis of the shoulder as may

occur in acute coronary thrombosis, and it takes a long time for it to get better. I do not feel that his left shoulder pain or left arm pain is associated with coronary disease at this time. From the point of view of this shoulder condition, what I usually do is refer them to the physical therapy department at Barnes Hospital where they seem to be quite successful in relieving most of this shoulder arm discomfort. Usually the pain goes away, and the patient will feel better after daily treatments there with heat and other types of manipulation, which they do. Sometimes these shoulder pains are just as severe as the original coronary pain, but this is not the case here. It is sufficiently troublesome, however, to make him anxious. Perhaps working the shoulder itself with the use of heat might be worthwhile, but I never seem to get the results they do.

In addition the patient is anxious and concerned. He finds that he is fearful if he has to leave town and stay away from home because his attack occurred in the hotel away from home. In talking to him about returning to work, it appears to me that if he could go to one destination not too far from home, and then return home to sleep that he could go back after several weeks. It should be on the basis of a little work at first and more later. He should not do active physical work, but perhaps do desk or supervisory type of activity. He asked me about his weight, and I told him that it would be worthwhile becoming a little thinner, although he has lost weight, which has been a good thing. As he gets more confidence in himself, I believe he will be in better shape and frame of mind to return to work. If you have anyone there, who knows the art of physical therapy in regard to the shoulder arm syndrome, this would be a worthwhile step in rehabilitating this man. I did not give any specific medications. He told me about what you are giving, and I told him to continue this medication. I do appreciate very much your referring this patient to me, and, if you have questions concerning him, please let me know. Best regards."

On August 29, 1950, Dr. Harrison reported as follows:

"Treatment—Hypnotics. Sedation. Bed-rest. Vaso-dilators. X-Rays—None. Estimated date of discharge—Unknown. Estimated date patient able to work—September 5, 1950. What permanent disability do you expect?—Unable to do manual labor."

On November 2, 1950, Dr. Harrison wrote the report, which is quoted below:

"I believe Mr. Brown's condition has reached a permanent stage as far as his heart is concerned. However, it is my policy to keep a patient under observation for one year following a myocardial infarction. If this meets with your approval, I will continue to do so. I do not expect much change in his condition between now and a year from the date of onset."

Dr. Harrison submitted his final report on December 15, 1950, which is as follows:

"Mr. Brown was in to see me the first part of this week, and at that time we discussed the probabilities of his being able to carry on with his work. He does not feel that he is able to do his job and himself justice by continuing; and, although his heart condition at the present time is apparently quite adequate, he must have complete freedom from mental unrest and worry. I, therefore, advised him to cease work and follow whatever occupation of an entirely sedentary nature he might find."

Mr. Brown returned to light supervisory work on September 1, 1950. Although Mr. Brown was never able to do more than limited supervisory work, he continued work for the Division until December 31, 1950, at which time he asked for and secured an extended leave of absence, because of his inability to do the work satisfactorily.

Following the injury, Mr. Brown was paid full salary through March 20, 1950 in the amount of $280.86. He was paid compensation at the rate of $27.00 a week for the period of April 1 to August 31, 1950, inclusive, in the amount of $632.56. Payments for total temporary disability equaled $913.42. Compensation was terminated August 31, 1950, because it was Mr. Brown's desire to return to work at the beginning of the month, rather than September 5th, as suggested by Dr. Harrison.

The Division has paid the following creditors in connection with Mr. Brown's injury: Dr. L. R. Illyes, Palestine - $6.00; Dr. Edward Massie, St. Louis, Missouri - $50.00; The Olney Sanitarium Clinic, Olney - $249.30; and the Parker Funeral Home (ambulance), Newton - $18.00, totalling $323.30.

No jurisdictional question is raised. Respondent and claimant were operating under the Workmen's Compensation Act, and the accident in question arose out of and in the course of the employment.

The only question is the extent of permanent disability suffered by claimant.

The record consists of the complaint, Departmental Report, stipulation waiving briefs of both parties, transcript of evidence, and abstract of evidence.

From the undisputed medical testimony, and the observations of our Commissioner, Henry S. Wise, the record shows that the claimant is permanently disabled; and has not been able, and is not able to do work of any kind.

We conclude, therefore, after a careful consideration of the record, that the claimant is entitled to an award for permanent total disability.

Claimant's compensation rate with four children is $20.00 per week. Since the accident occurred subsequent to July 1, 1949, this must be increased 50%, making the compensation rate to claimant of $30.00 per week.

The claimant is, therefore, entitled to an award of $8,499.99 under Section 8, Paragraph (f) and Section 7, Paragraphs (a) (h) (3), less the sum of $913.42, which was paid claimant as wages and for temporary total disability, or a total award of $7,586.57, payable as follows:

$2,434.29, which has accrued from February 16, 1950 to September 7, 1951, from which must be deducted the sum of $913.42, making a sum of $1,520.87, which is payable forthwith;

$6,065.70, to be paid in weekly installments of $30.00, beginning September 14, 1951, for a period of 202 weeks with a final payment of $5.70; thereafter a pension for life in the sum of $680.00 annually, payable in monthly installments of $56.66.

It is recommended that the Division of Highways obtain the amount of the bill of Dr. Harrison of Olney, Illinois, and make payment of same.

The testimony on the hearing before Commissioner Henry S. Wise was taken and transcribed by Neva June Matson, who has submitted a statement for

$84.00 for her services. This charge is reasonable and proper, and an award of $84.00 is hereby entered in favor of Neva June Matson, payable forthwith.

This award is subject to the approval of the Governor, as provided in Section 3 of "An Act concerning the payment of compensation awards to State employees".